# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| Stephen Matakovich, | : |
| | : |
| Petitioner | : |
| | : |
| v. | : No. 1298 C.D. 2016 |
| | : Submitted: January 13, 2017 |
| Unemployment Compensation | : |
| Board of Review, | : |
| | : |
| Respondent | : |

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
HONORABLE JULIA K. HEARTHWAY, Judge
HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION NOT REPORTED

**MEMORANDUM OPINION BY**
**SENIOR JUDGE COLINS**                         **FILED:  March 29, 2017**


Stephen Matakovich (Claimant) petitions for review of the July 13, 2016 order of the Unemployment Compensation Board of Review (Board) concluding that Claimant was ineligible for unemployment compensation benefits under Section 402(e) of the Unemployment Compensation Law[1] (Law) because he violated the policies and procedures of his employer, the City of Pittsburgh Police Department (Employer) and his conduct in doing so amounted to willful misconduct under the Law.  We affirm.

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e). Section 402(e) of the Law provides that an employee shall be ineligible for compensation for any week in which his or her unemployment is due to discharge for willful misconduct connected to his or her work.  43 P.S. § 802(e).

Claimant was employed full-time as a police sergeant with Employer from January 3, 1994 through December 2, 2015. (Record Item (R. Item) 12, Referee's Decision/Order, Findings of Fact (F.F.) ¶ 1.) On November 28, 2015, Claimant was working a detail at Heinz Field, during a high school championship football game, when he was called by security guards also working there and requested to go to Gate 5, where an intoxicated male was being detained by the security guards. (R. Item 12, F.F. ¶ 10; R. Item 11, Referee's Hearing: Transcript of Testimony (H.T.) at 68.) As a result of incidents that occurred during and following Claimant's encounter with the intoxicated male (referred to herein as the "actor"), Claimant was discharged from his employment and filed an internet initial claim for unemployment compensation; Claimant listed as the reasons for the actions that caused him to be discharged, that he "was making a lawful arrest, [he] was forced to fight the actor, the Chief believes that my actions were excessive, despite the actor not being injured." (R. Item 2, Internet Initial Claims.)

The Department issued a Notice of Determination finding Claimant ineligible for unemployment compensation. (R. Item 5, Notice of Determination.) Claimant petitioned for review of the Department's Notice of Determination and hearings were held before a Referee on April 26, 2016 and on May 11, 2016. (R. Items 9 and 11, Referee's Hearing: Transcripts of Testimony.)

At the April 26, 2016 hearing, Employer was represented by its Tax Consultant Representative (ETC Rep), who presented the testimony of five witnesses: Employer's Director of Public Safety; Victor Joseph, Jr., Employer's Rear Police Lieutenant, Major Crimes (Lt. Joseph); Timothy Williams, Director of Security, Heinz Field; Todd Siegal, City of Pittsburgh Director of Personnel; and Jenifer Matson, City of Pittsburgh Assistant Director of Personnel. At the May 11,

2016 hearing, Employer's ETC Rep appeared, and the Director of Public Safety and Lt. Joseph testified for Employer. Claimant, represented by counsel, testified at both hearings, together with witness Robert Swartzwelder, a Master Police Officer (Swartzwelder). At the May 11, 2016 hearing, a second witness for Claimant, Bryan Campbell, the attorney for the Fraternal Order of Police (Campbell), testified. At the second hearing, the Referee devoted extensive time to the viewing of a surveillance video of the incident, taken at Heinz Field, with narration offered during the hearing by both Claimant and Employer's witnesses. Following the May 11, 2016 hearing, the Referee issued a decision and order affirming the Notice of Determination; Claimant then appealed the Referee's decision to the Board.

On July 13, 2016, the Board issued a decision and order affirming the Referee's conclusion that Claimant was ineligible to receive unemployment compensation under the Law because he was discharged from his employment due to willful misconduct. (R. Item 16, Board Decision and Order.) Claimant then petitioned this Court for review of the Board's decision and order.[2]

In its decision, the Board adopted and incorporated the Referee's findings of fact and conclusions or law, including the following relevant findings:

> 2. In 1997, the City of Pittsburgh implemented a use of force policy and established an Office of Municipal

---

[2] This Court's scope of review is limited to determining whether findings of facts are supported by substantial evidence, whether errors of law were committed, and whether constitutional rights were violated. *Rossi v. Unemployment Compensation Board of Review*, 676 A.2d 194, 197 n.3 (Pa. 1996). Substantial evidence is defined as "such relevant evidence which a reasonable mind would accept as adequate to support a conclusion." *Guthrie v. Unemployment Compensation Board of Review*, 738 A.2d 518, 521 (Pa. Cmwlth. 1999). Where the Board's findings of fact are supported by substantial evidence, the findings are conclusive on appeal. *Graham v. Unemployment Compensation Board of Review*, 840 A.2d 1054, 1059 (Pa. Cmwlth. 2004).

3

Investigations as part of an agreement to resolve allegations of a pattern or practice of conduct by law enforcement officers of the Pittsburgh Bureau of Police that deprived persons of rights, privileges, and immunities secured and protected by the Constitution and laws of the United States.

3. The Office of Municipal Investigations (OMI) is an independent agency allowing citizens to come forward with complaints of police misconduct without fear of retribution or retaliation.

4. Per Consent Decree of April 16, 1997, final authority and responsibility for determining the disposition of a citizen complaint shall rest with OMI.

5. Upon completion of an OMI investigation, the findings and conclusions are given to the Chief of Police who processes the findings in compliance with the Working Agreement between the City of Pittsburgh and the Fraternal Order of Police, Fort Pitt Lodge No. 1.

6. The Confidence in Law Enforcement Act [Act of January 29, 2004, P.L. 4, No. 2, 53 P.S. §752.4] provides for suspension from employment of a law enforcement officer pending disposition of criminal charges that would prohibit employment as a law enforcement officer and this Act provides for termination if an individual is convicted of criminal charges that would prohibit employment as a law enforcement officer.

7. The employer has a use of force policy providing that an officer "shall only use that level of control which he/she might reasonably believe is necessary to affect an arrest or to protect the officer(s) or others from physical harm."

8. The employer has a Continuum of Control Policy providing that an officer may utilize a control option one level higher than the resistance demonstrated by a subject.

4

(R. Item 16, Board's Order; R. Item 12, F.F. ¶¶ 2-8.)  With regard to the events that transpired during the incident at Heinz Field, the Board found that Claimant initially informed the actor that he was no longer permitted entrance due to his impaired state and was required to leave, at which time the actor began to walk away but then turned and debated the issue, stating that his friends were inside and they held the keys to the actor's truck.  (R. Item 16; R. Item 12, F.F. ¶¶ 11-13.) The actor was approximately four feet in distance from Claimant, with his arms by his sides and both hands in the side pockets of his pants, with his right thumb out of his right side pocket; Claimant told the actor "I'm going to put my foot up you're a** if you don't leave and you can taste my shoelaces."  (R. Item 12,  F.F. ¶¶ 14-15.)  Claimant did not inform the actor that he was under arrest, and although he passively resisted Claimant's repeated instruction to leave, the actor maintained a relaxed and non-aggressive body posture.  (*Id.*, F.F. ¶¶ 20-21.)  Claimant then took a few steps toward the actor and abruptly shoved him to the hard cement ground with the force of his open palms against the actor's chest; the actor fell backwards on his back, and then attempted to get up from the ground as he exclaimed, "what the f**k?" (*Id.*, F.F. ¶¶ 22-23.)  Claimant again pushed the actor back to the ground; the actor again attempted to get up but Claimant knocked him back a third time, with a right cross, closed-fist punch to the actor's face; the actor continued his attempt to get up off the ground and tried to protect himself as Claimant continued to punch the actor with his fists.  (*Id.*, F.F. ¶¶ 24-26.)  The actor then managed to get up off the ground but Claimant immediately tackled him and took him back to the ground as he continued to attack the actor with his fists; the actor was ultimately subdued and handcuffed, as three of the security guards assisted Claimant in restraining him.  (*Id.*, F.F. ¶¶ 27-28.)

5

Claimant filed charges against the actor including criminal trespass, public drunkenness, aggravated assault, and underage purchase, consumption, possession and transportation of liquor.[3] (R. Item 12, F.F. ¶ 30.) In his narrative of the incident, Claimant asserted that the actor "stepped his leg back and bladed his body slightly and appeared to have clinched his right fist clinched, and then rocked onto the balls of his feet from his heels" and further stated "I immediately recognized this as a premature sign of an individual becoming prepared to take an aggressive attacking position." (*Id.*, F.F. ¶ 31; R. Item 3, Employer Separation Information, Claimant's Investigative Report.) Claimant's narrative, as set forth in his investigative report, further states:

> Believing that [the actor] was going to attempt to assault me, I pushed him backwards to create a reactionary gap between us. [The actor] fell backwards and began to get up quickly and he stated, "what the f**k?" I pushed [the actor] back and stated, "don't do it." [The actor] then lunged towards me and I delivered a right cross closed fisted punch to his face, knocking him to the ground, to which he came back toward me and I then followed with approximately four palm heel strikes to his torso and face. [The actor] then punched me in my chest and grabbed my jacket. I then struck [the actor's] hand in attempt to free my coat from his grasp by striking his grip approximately six times with a closed fist.

(R. Item 3, Employer Separation Information, Investigative Report.)

With regard to the investigation conducted by Employer and subsequent action taken, the Board found that:

---

[3] At the second hearing, Lt. Joseph testified that he had been told by the District Attorney's office that the aggravated assault charge against the actor had been withdrawn. (R. Item 11, H.T. at 44.)

32. After receiving surveillance video of the above incident from Heinz Field, the employer began an internal investigation and also referred the incident to the City's Office of Municipal Investigations.

33. The internal investigation was conducted by the employer's Lieutenant of Major Crimes.

34. The employer placed the claimant on paid administrative leave beginning December 3, 2015.

35. The employer's Lieutenant of Major Crimes determined that the claimant assaulted the actor on November 28, 2015 and that the claimant falsified his narrative.

36. On January 15, 2016, a disciplinary report was filed against the claimant charging the claimant with violating Bureau of Police Rules and Regulations including Standards of Conduct and Use of Force.

37. The claimant was determined by the employer to have violated the employer's Standards of Conduct policy including obedience to orders and/or laws, conduct unbecoming a member of the Pittsburgh Police Department, and truthfulness.

38. The Lieutenant of Major Crimes filed charges against the claimant including Simple Assault and Official Oppression.

39. On February 1, 2016, the criminal case against the claimant was dismissed at a preliminary criminal trial.

40. The claimant was scheduled for an interview with OMI on February 2, 2016 but declined participation on the advice of his attorney.

41. On February 8, 2016, the Chief of Police recommended a five-day suspension pending termination and the claimant appealed.

42. On February 26, 2016, criminal charges were refiled with the addition of a charge of perjury.

43. On March 1, 2016, the employer discharged the claimant for violation of Bureau of Police Rules and Regulations including Standards of Conduct and Use of Force.

(R. Item 12, F.F. ¶¶ 32-43.) Employer's Police Discipline Procedure mandates that all disciplinary action is initiated through the preparation and filing of a Disciplinary Action Report (DAR); within ten days after the report is signed by the Police Chief, a meeting must be held between the Police Chief, the police officer, the Fraternal Order of Police representative, and the Director of Public Safety, and the police officer is afforded the opportunity to respond to the charges against him or her. (R. Item 11, Exhibit, Police Discipline Procedure.)

The Board adopted the Referee's conclusion that Employer had provided credible testimony and evidence to demonstrate Claimant's violation of Employer's Standards of Conduct policy, Use of Force policy, and Continuum of Control policy. As stated by the Referee and incorporated into the Board's decision, "[t]he video evidence clearly demonstrates that [C]laimant engaged in assault and excessive force against an actor engaged in passive resistance to [C]laimant's instructions to leave the premises." (R. Item 12, Reasoning.) Claimant's testimony was found not credible and "belied by both the video evidence and [C]laimant's own admissions that the actor's arms remained at his side and his hands in his pockets." (*Id.*)

Before this Court, Claimant contends that: (1) the Board lacked substantial evidence to support a finding of willful misconduct; (2) the Board should have determined that Claimant's due process rights were violated by the manner in which Employer conducted its investigation; (3) the Board failed to

8

allow Claimant to present evidence of similarly situated individuals and its past practices of placing employees on paid administrative leave until criminal charges were resolved; and (4) the Board erred in failing to find that Employer violated the Confidence in Law Enforcement Act when it terminated Claimant prior to the resolution of the criminal charges against him.

The question of whether an employee's actions constitute "willful misconduct" is a question of law subject to this Court's review. *Rossi v. Unemployment Compensation Board of Review*, 676 A.2d 194, 197 (Pa. 1996). Willful misconduct is defined as: (i) wanton or willful disregard for an employer's interests; (ii) deliberate violation of an employer's rules; (iii) disregard for standards of behavior which an employer can rightfully expect of an employee; or (iv) negligence indicating an intentional disregard of the employer's interest or an employee's duties or obligations. *Caterpillar, Inc. v. Unemployment Compensation Board of Review*, 703 A.2d 452, 456 (Pa. 1997). It is the employer's burden to demonstrate that an employee has engaged in willful misconduct; however, even if an employer has met its burden, an employee can prove that the actions were justifiable and reasonable under the circumstances such that the employee had good cause and the actions will not be considered willful misconduct. *Rossi*, 676 A.2d at 197.

At the second hearing, the Director of Public Safety testified that during a meeting he held with Claimant on February 16, 2016, he and Claimant viewed the twenty minute surveillance video together, going over it frame by frame. (R. Item 11, H.T. at 3-4.) He testified as to what he observed on the video, and the inconsistencies he felt existed between what he had observed and the manner in which Claimant described the incident in his written arrest report.

9

Lt. Joseph, who was charged with investigating the incident and completing the DAR, testified that in addition to viewing the video, he read Claimant's police report and affidavit of probable cause, interviewed nine security guard witnesses who observed the incident at Heinz Field, and offered the video to the Police Bureau's Use of Force expert for viewing and the submission of a report. (*Id*., H.T. at 35-36.) In his DAR, Lt. Joseph noted that the Use of Force expert's opinion was that Claimant's use of force was not a "reasonable" use of force and was in fact "excessive" force. (R. Item 3, Employer Separation Information, Disciplinary Action Report.) Before the Referee, Lt. Joseph was asked to describe the areas he observed in the video that did not match Claimant's depiction of events as set forth in his written arrest report. He testified that he did not see a right fist being clenched, he did not see the actor rock onto the balls of his feet from his heels and he saw no aggravated assault on the part of the actor; he stated that there was nothing in the video to have caused Claimant to close the gap between the actor and himself or to take the action that he took. (R. Item 11, H.T. at 38-40.) In his DAR report, Lt. Joseph notes that the video of the incident "is not congruent with [Claimant's] report and affidavit. The video does not depict [the actor] at any time in an aggressive, threatening or fighting stance. [The actor] does not appear to be combative or resist arrest." (R. Item 3, Disciplinary Action Report.) Lt. Joseph further notes that numerous eyewitnesses were interviewed, and none heard the actor making any verbal threats, nor did they see the actor take any type of "fighting stance." (*Id*.) The DAR sets forth the Employer's Standards of Conduct policies and procedures which Claimant was charged with violating, including: 3.1-Obedience to Orders and/or Laws; 3.6-Conduct Unbecoming a Member or Employee; 3.19- Truthfulness; and from the Bureau of Police Use of

10

Force policies and procedures, 3.0-Use of Force. (*Id.,* Pittsburgh Bureau of Police Standards of Conduct Policy, Use of Force Policy.)

Master Police Officer Swartzwelder, an instructor on use of force tactics, testified on behalf of Claimant. Swartzwelder, who reviewed the video, stated that Claimant's actions were reasonable based on the totality of the circumstances he faced during the incident, and that Claimant used both soft empty hand and hard empty hand techniques as outlined by and in accordance with City of Pittsburgh policies on use of force and continuum of control. (*Id.*, H.T. at 106, 108.)

Fraternal Order of Police attorney Campbell also testified on Claimant's behalf, describing the process by which citizen complaints of police misconduct and possible civil rights violations are investigated by the Office of Municipal Investigations (OMI). (R. Item 11, H.T. at 115-119.) Campbell discussed the 1997 Consent Decree, pursuant to which the City of Pittsburgh agreed to develop and implement a use of force policy and granted final authority and responsibility for determining the disposition of a citizen complaint with OMI. (*Id.*; Exhibit C2, Consent Decree.) Campbell asserted that Employer was prohibited from conducting an internal investigation of the incident and from terminating Claimant's employment prior to the conclusion of OMI's investigation. (*Id.*, H.T. at 125, 136.) Campbell further testified as to the actions the Bureau of Police is required to take under the Confidence in Law Enforcement Act when a police officer is charged with an offense, indicating that an officer must be suspended, but cannot be terminated from his employment unless and until he or she is convicted of criminal charges. (*Id.*, H.T. at 132-134.) However, on questioning by the Referee, Campbell allowed that the Confidence in Law

11

Enforcement Act does not prohibit the police department from terminating an officer's employment for violation of its policies and procedures; that no one at the police department ever indicated to Campbell that Claimant's employment was terminated as a result of criminal charges being filed against him; and that the actor has never filed a complaint with OMI. (*Id*., H.T. at 133, 135-136.)

Here, there is substantial evidence establishing that Claimant committed willful misconduct by violating Employer's policies and procedures. Claimant's testimony as to justification for his use of force was found not credible, and the Board found further that his testimony was belied by both the video evidence and his own admissions as to where and how the actor held his arms. (R. Item 16, Board's Order.) Moreover, there is simply no evidence that Employer was precluded by the establishment of OMI, and the citizen complaint process that it implements from conducting its own internal investigation of the incident and determining whether or not Claimant violated its policies and procedures. As the Board noted, "[E]mployer's preemptive disciplinary action in this case appears congruent with the fundamental intent of establishing OMI as a means to protect the citizenry against police misconduct and abuse of power." (*Id*.) We also reject Claimant's argument that Employer was prohibited from discharging Claimant prior to disposition of the criminal charges filed, dismissed, and re-filed against him; Employer established, and Claimant's witness corroborated the fact that Claimant was not discharged from his employment because of pending criminal charges but rather for violation of Employer's policies and procedures. Finally, Claimant's argument that Board failed to allow Claimant to present evidence of similarly situated individuals and past practices of placing employees on paid administrative leave until criminal charges were resolved fails because it is

12

unsupported by the record. Over Employer's objection, the Referee permitted Claimant to offer such evidence, but Claimant failed to do so. (R. Item 11, H.T. at 28.)

We find no error in the Board's affirmance of the Referee's determination that Claimant's actions demonstrated a violation of Employer's policies and procedures and a willful disregard of Employer's interest rising to the level of willful misconduct. Accordingly, the order of the Board is affirmed.


_____
**JAMES GARDNER COLINS, Senior Judge**

13

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Stephen Matakovich,                    :
                                       :
                    Petitioner         :
                                       :
         v.                            :  No. 1298 C.D. 2016
                                       :
Unemployment Compensation              :
Board of Review,                       :
                                       :
                    Respondent         :

# **O R D E R**

AND NOW this 29th day of March, 2017, the order of the Unemployment Compensation Board of Review in the above-captioned matter is AFFIRMED.

_____
**JAMES GARDNER COLINS, Senior Judge**